**Mark JUSTICE, Appellant (Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

No. 88–189.

Supreme Court of Wyoming.

June 12, 1989.

Wyoming Public Defender Program: Leonard D. Munker, State Public Defender, Michael Cornia, Appellate Counsel, Cheyenne, for appellant.

Joseph B. Meyer, Atty. Gen., John W. Renneisen, Deputy Atty. Gen., and Sylvia Lee Hackl, Sr. Asst. Atty. Gen., for appellee.

Before THOMAS, URBIGKIT, MACY and GOLDEN, JJ., and GRANT, District Judge.

THOMAS, Justice.

The primary problem the court must address in this case, an appeal by Mark Justice from his conviction for the crime of aggravated robbery, is his claim of lack of relevancy of evidence of collateral misconduct which he contends was admitted improperly, preventing him from having a fair trial. The several matters of accused evidence (which include testimony about events other than collateral misconduct) related to evidence of his theft of fishing tackle prior to the charged armed robbery; the prior forgery of a check of the robbery victims; testimony concerning his desire to kill the victims to assure that they could not later testify that they had recognized him at the crime scene; testimony of an accomplice about the reactions of robbery victims; and testimony from the victims about the impact of crime on them. In addition, questions are raised concerning the propriety of the limiting instruction that the court gave to the jury; the chilling of presentation by Justice of evidence that he had no prior felony convictions; whether there was any possibility that the admission of the accused evidence constituted harmless error; and whether the doctrine of cumulative error should be invoked to reverse the conviction. The court is satisfied from an analysis of this record, in light of the pertinent law, that no reversible error was committed, and the judgment and sentence is affirmed.

Mark Justice was tried by the jury on a single count of aggravated robbery in violation of §§ 6–2–401(a)(ii) and (c)(ii) and 6–3–402, W.S.1977.[1] After the jury found him guilty, Justice was sentenced to a term of not less than seven and one-half nor more than twelve and one-half years in the state penitentiary, with credit given for pre-trial incarceration. It is from that judgment and sentence that Justice has taken this appeal.

In his Brief of Appellant, Justice lists these issues:

"I. Whether it was error to admit testimony concerning alleged theft of fishing tackle by the defendant.

"II. Whether it was error to admit testimony concerning alleged forgery by the defendant.

"III. Was the limiting instruction given by the court concerning the use of the evidence of prior 'bad acts' sufficient?

"IV. Was the admission of the 'bad act' evidence harmless error?

"V. Was the admission of 'victim impact statements' error?

"VI. Was it plain error to admit testimony to the effect that the defendant wanted to kill the witnesses?

"VII. Was appellant's lack of prior felony convictions admissible?

"VIII. Was the admission of the 'expert' testimony of Randy Morgan plain error?

1. Section 6–2–401, W.S.1977, provides, in pertinent part:
   "(a) A person is guilty of robbery if in the course of committing a crime defined by W.S. 6–3–402 he:
   * * * * * *
   "(ii) Threatens another with or intentionally puts him in fear of immediate bodily injury * * *.
   * * * * * *
   "(c) Aggravated robbery is a felony punishable by imprisonment for not less than five (5) years nor more than twenty-five (25) years if in the course of committing the crime of robbery the person:
   * * * * * *
   "(ii) Uses or exhibits a deadly weapon or a simulated deadly weapon."
   Section 6–3–402, W.S.1977, provides, in pertinent part:
   "(a) A person who steals, takes and carries, leads or drives away property of another with intent to deprive the owner or lawful possessor is guilty of larceny."

**1004**

"IX. Should the doctrine of cumulative error apply?"

The State of Wyoming sets forth the following issues:

"I. Whether it was proper to admit evidence of events which constituted an integral part of the aggravated robbery.

"II. Whether the admission of testimony regarding the effect of the crime on the victims was error, and requires reversal of Appellant's conviction.

"III. Whether Randy Morgan's testimony regarding the reactions of robbery victims was offered as expert testimony, and was properly admitted.

"IV. Whether the trial court properly instructed the jury to disregard defense counsel's statements regarding Appellant's criminal history.

"V. Whether the multiple alleged errors may be combined to require reversal under the concept of cumulative error."

In his Reply Brief, Justice then offers this statement of an additional issue:

"Whether the admission of the evidence of the alleged theft, forgery and desire of the defendant to kill the victims was harmless."

On June 21, 1987, at approximately 9:45 P.M., a man, his wife, and the wife's teen-age sister were the victims of an armed robbery occurring in their home at the Lake Stop, located about one-quarter mile from Lake DeSmet and some seven miles north of Buffalo. The Lake Stop is a convenience store, tackle and bait shop, and a small gas station which offers merchandise and services to fishermen and others who frequent Lake DeSmet as a recreational area. The circumstances of the robbery were captured succinctly by defense counsel in closing argument when he said that the man, woman, and girl "are three good, decent, nice folks who are the victims of a brutal, savage robbery, * * *." Three men burst into their living quarters at the Lake Stop, and two of them, brandishing pistols, directed the man and the teen-age girl, who were watching television in the living room, to lay face down on the floor. In a few minutes, the wife, who had gone to bed in the bedroom, was brought into the living room by one of the robbers and directed to lay down next to her husband. The three victims were bound, and their faces were covered with a blanket so that they could not observe the robbers. The cash from their business operations, two shotguns, and a rifle were taken by the robbers who then made their escape in the wife's Buick automobile.

Mark Justice, who was charged in January, 1988 with being one of the perpetrators of the aggravated robbery, first was associated with the Lake Stop and the victims during the construction phase of the Lake Stop in April of 1987. He had been hired by a foreman for the construction to assist in building fences, decks, and similar things. After working for some twenty-eight days, Justice left the Lake Stop when the construction phase had been finished but, some four days later, after the store had been opened, he appeared and camped out at Lake DeSmet. A day or so later, he asked about a job with the victims, and they advised him that they had no money with which to hire an employee. Justice then suggested that he was completely at loose ends and that he would work for a while if they would give him a place to stay, board, and whatever they might be able to pay him. The ultimate arrangement was that he could work for approximately thirty days during which time he would be furnished board and room and, at the end of that time, the husband would give him a 1978 Yamaha motorcycle.

Justice worked for the victims for about two weeks. He built some small toolsheds, helped put boats in and out of the water, and even helped with running the store on some occasions. Then, one day, he was sent to Buffalo to pick up an auger that had been left there for repairs. Justice did not return as promptly as expected, and the husband, later in the afternoon, went looking for him and found him drinking with some friends. He asked Justice if he was coming home. Justice said that he would be along soon, and the husband asked him to take the car home promptly. Justice then drove the car in an abusive manner and smashed the stereo system with his

foot or his hand. There followed a period of literal uproar during which Justice was driving his motorcycle in a reckless and dangerous manner, and the husband and he had a quarrel which was precipitated by an inquiry about checks missing from the checkbook. Justice decided to go look for the checks when the husband decided he would call the sheriff, and he did return in about an hour and a half. He was even more intoxicated. He produced one check, but he said that the other was lost. What followed was a very angry discussion between Justice and the husband during the course of which Justice offered to fight the husband several times. The wife and her sister became quite upset and frightened about his conduct.

Ultimately, Justice went to sleep and, the next morning, the husband told him he would have to leave. He filled the motorcycle with gas and sent Justice on his way. The husband then went to the IGA store to inquire about the missing check because Justice had admitted cashing the check there to pay for film for the business. The wife had given him $20 for that purpose, but he had used the cash to purchase beer for himself and his friends. When the husband was leaving the IGA store, Justice came up on his motorcycle and asked for some money. The husband furnished some $6 or $7 worth of change that he had in his vehicle, and Justice then left. The armed robbery at the Lake Stop occurred on the evening of the following day.

At the trial in this case, the only element of the offense that was in issue was the identity of Mark Justice as one of the perpetrators. There clearly was no dispute whatsoever about any of the other elements of the crime. Because of the circumstances of the robbery and the requirement that they keep their heads covered, none of the victims could identify Justice. The direct evidence connecting Justice with the crime came from an accomplice whose testimony clearly established the element of identity so far as Justice was concerned. The accomplice, however, had a lengthy prior criminal history, and the prosecuting attorney had agreed not to prosecute him for this crime in exchange for testimony against Justice. The accomplice had been connected with the crime because the rifle that was stolen was discovered in a search of the home of a relative of the accomplice, and the relative promptly explained the source of the rifle. Due to the concern that arose over the credibility of the accomplice, the prosecutor chose to inject other evidence concerning identity into the case. The other evidence was designed to corroborate the testimony of the accomplice, but it led to the contentions of error made by Justice in this appeal.

The claims of error in the admission of evidence relate to the theft of fishing tackle from the Lake Stop which the accomplice said Justice retrieved the day after the robbery from the place where he had buried it; the forgery of the check by Justice at the IGA store; and the testimony of the accomplice that Justice wanted to kill everyone at the Lake Stop on the night of the robbery. In connection with these claims of error, Justice asserts the inefficacy of a limiting instruction with respect to curing any prejudice, and these claims of error are important in the final contention of cumulative error.

The matter of the check first came up during the testimony of the husband who was explaining the events leading up to the termination of Justice's employment at the Lake Stop. He stated that after discussing the damage to the stereo system with Justice, he went back to the car and examined a checkbook which had been in it. He testified that he then realized that two checks were missing, and he asked his wife about them. At about this juncture, an objection was lodged to the lack of materiality and the absence of a foundation. The witness then was asked if he had discussed the checks with Justice, and he answered that Justice told him he did not know where the checks were. He said that when he advised Justice that he would call the sheriff, Justice asked for two hours to see if he could get the checks. According to the husband's testimony, Justice explained that one of his drinking companions must have taken them. He testified that Justice left and came back in about an hour and a

half. He returned only one check, and he said he didn't know where the other check was, that it must have been lost. The husband went on to relate that, in the course of a rather heated discussion, he said that he was going to call the sheriff because he didn't know where the check was. The husband then related that the next morning when he woke Justice up, Justice told him that he had forged the check at the IGA for film because he had spent the money intended for the film on beer. No objection was interposed at this point. The husband then testified about his attempts to discover the amount of the check through IGA, and after having identified the check, an objection to its admission was sustained on the ground that it was not relevant.

The other objectionable material came in during the examination of the accomplice. The stage had been set when the husband testified, without objection, that he went looking around the place the second day after the robbery, after hearing noise during the night, and found some footprints. He then discovered that someone had dug a hole behind the propane tank. He reported that there was dirt scattered around; there were some tennis shoe tracks; a cardboard box was in the hole; and it appeared that the box had been taped up. He told one of the law enforcement officers about it and, within a couple of days, rain washed out the tracks. He said that he was only aware that someone had dug a hole.

In connection with a concern about some proffered testimony from the investigating officer, the following appears in the record:

"THE COURT: All right. With regard to the, you know, testimony about the digging around behind the propane tank, I guess when [the accomplice] testifies, he's going to testify that the defendant told him that he had hidden some stuff there and that after the robbery he had gone back and picked it up.

"MR. GODDARD: And produced it.

"THE COURT: And he produced it, and that's to—you're offering that to establish the credibility of the defendant—no, [the accomplice]—his credibility.

"MR. GODDARD: Yes.

"THE COURT: Because there has been testimony by [the husband] that he found the ground disturbed. He heard somebody rustling around outside and found the ground disturbed a day or two after the event.

"Well, I guess it's relevant, but I'm going to do it with this, because I think there's been twice that there's been some testimony about him forging this check, and I'm going to let it in, but I'm also going to give the defense an instruction that, you know, that whether the defendant did or did not commit forgery or whether he had taken anything from them at some other time, he is not being charged with that, and they can't consider that and they should not in any way allow that to influence their decision as to whether or not he's guilty of the charge that he's alleged to have committed—the armed robbery.

"MR. TATE: I thank the Court for that instruction, but if you think about it, if—

"THE COURT: You don't have to have the instruction if you don't want it.

"MR. TATE: I want the instruction, but if you think about it—but if you're saying that that evidence should not in any way influence their judgment, then by definition, that evidence is not relevant.

"THE COURT: It's not irrelevant because it does go to the credibility. I mean that's my opinion. It doesn't mean it's right but that's my opinion."

The accomplice then was permitted to testify as follows:

"Q How long did Mark stay at your house then?

"A Approximately two weeks, maybe two and a half weeks.

"Q Did you ever return to Lake DeSmet?

"A No.

"Q Did Mark?

"A Mark did.

"Q What were the circumstances?

"MR. TATE: Objection, your Honor. This is irrelevant.

"THE COURT: Overruled.

"Q (By Mr. Goddard) What were the circumstances?

"A Mark wanted me to bring him back up to the Lake Stop for a box of tackle, and I told him that he was crazy to want to come back up to the Lake Stop. This was just two days after the robbery took place. So I told him that I would not take him back up here. So he got on his motorcycle and said that he was going back to the Lake Stop to dig up the tackle and that he would be back the following morning.

"Q Where did the tackle come from?

"A From when he was working in the store.

"MR. TATE: Objection, your Honor. Foundation.

"THE COURT: Well, he'll have to state how he knows if he knows.

"Q (By Mr. Tate) Did Mark tell you where the tackle came from?

"A Yes.

"Q Where did he tell you that it came from?

"A From the store.

"Q And how did it get in the box?

"A He would work in the store, and I guess he worked by himself, and he loaded up—

"MR. TATE: Excuse me. Your Honor, I object. We're having the witness testify about things he's guessing about. He's obviously speculating and concluding about things he knows nothing about.

"THE COURT: Well, he can testify as to what the defendant told him. If he doesn't know, he's going to have to—

"Q (By Mr. Goddard) To your knowledge, how did the materials get in the box?

"A Mark put them there.

"Q And so you wouldn't take him but he went anyway.

"A Right.

"Q What happened then? When did you next see him?

"A The following morning.

"Q And please explain to the jury what happened then.

"A He got to my house on his motorcycle. He had a great big cardboard box full of tackle, two fishing poles, two new reels, probably a thousand dollars worth of tackle.

"Q What did he do with it?

"A Poured it out all over my floor.

"Q How did it appear?

"A Like it was in the ground?

"Q Why do you say that?

"A Mark had told me that he buried this box of tackle next to the propane tank at the Lake Stop.

"Q Okay. So did it have dirt then?

"A Yes, it did."

The accomplice also testified that there was concern about the victims recognizing Justice. That concern was expressed, and Justice thought that everybody should be killed so that there would not be any witnesses. The accomplice testified that Justice thought the victims would recognize him and killing them would guarantee that they would not. The accomplice then claimed to have persuaded Justice not to kill the people because of his impression of the effect of the circumstances surrounding an armed robbery upon victims. He said:

"Q Is there a pattern that happens when you're doing—I don't know if I can qualify you as an expert—something that happens when you're doing an armed robbery and you point the gun?

"A Well, it automatically puts the receiver in a state of shock.

"Q And you've noticed that?

"A Yes.

"Q And does that make it difficult for them to recognize you at a later time?

"A Yes, it does."

This latter testimony serves as the basis for the contention that the accomplice should not have been permitted to testify about the reactions of crime victims.

In the course of his testimony, the accomplice explained that there was a boat behind the Lake Stop and that on their way to accomplish the robbery they went into the boat where Justice got a baseball cap which he put on and tucked his hair under-

neath it. He then pulled the cap down so that somebody looking at him could not see his face, and he donned a pair of sunglasses. In addition, he took a green fatigue-like jacket to cover his tatoos. The accomplice also testified that it was from the boat that the rope was taken to be used to bind up the victims.

We address together the claims of error relating to the admission of evidence focusing upon the context of this trial. Justice claims the evidence not to be relevant to any of the elements of the charged offense but, in making that claim, the element of the identity of Justice as a perpetrator is omitted. Identity, in fact, was the only element of the offense that was in any way in issue at this trial. Consequently, relevancy must be considered in the context of establishing the identity of Justice as a perpetrator of this offense, or, in the instance of the evidence about Justice suggesting that the victims be eliminated, as a part of the history of the event or the natural development of the facts.

██ The accomplice related to the jury that Justice wanted to kill the victims and that he was successful in his effort to dissuade Justice during the testimony in which the accomplice described the events surrounding the commission of the crime. That testimony certainly would not enhance the impression the jury might have of Justice, but it clearly fits the rule articulated in *Crozier v. State*, 723 P.2d 42 (Wyo. 1986). Not only does it form a part of the history of the event, but it, indeed, did serve to enhance the natural development of the facts. See *Makinen v. State*, 737 P.2d 345 (Wyo.1987). It explained the steps that Justice took to disguise himself, and those steps manifested familiarity with the surroundings at the Lake Stop. Familiarity with the surroundings clearly is relevant with respect to the identity of Justice as a perpetrator. See *Miller v. State*, 755 P.2d 855 (Wyo.1988); *Scadden v. State*, 732 P.2d 1036 (Wyo.1987).

██ Much the same justification is present with respect to the testimony about the check, including the fact that Justice admitted forging it. This testimony also served to enhance the natural development of the facts and, indeed, was an almost indispensable event with respect to explaining the quarrel between the male victim and Justice on the night before Justice was discharged. Justice's statement to his accomplice that he was owed money by the husband and wife for work he had done at the Lake Stop came into evidence without objection, and the testimony about the checks, like this latter statement, served to demonstrate animosity toward the victims and a motive for revenge. The evidence of motive is relevant and admissible. *Shaffer v. State*, 640 P.2d 88, 31 A.L.R.4th 166 (Wyo.1982). It is material "because evidence of motive can lead to an inference of identity which is an element of this crime." *Coleman v. State*, 741 P.2d 99, 105 (Wyo. 1987).

██ A bit deeper analysis is necessary with respect to the testimony about the theft of the fishing tackle. As is evident from the cross-examination of the accomplice and the closing argument on behalf of Justice, it was the theory of the defense that the accomplice, being presented with an opportunity to obtain leniency for himself but not wishing to disclose the true identity of the other robbers, seized upon Justice as a person to implicate. Essentially, the argument was that the accomplice needed to name some individual, and Justice was vulnerable to the accusation. The theory was not implausible, and the need that was perceived by the prosecuting attorney to corroborate the testimony of the accomplice is understandable. The male victim knew that something had been dug up from behind the propane tank. It is unlikely that it would have occurred to the accomplice to talk about someone digging up fishing tackle and bringing it back to Casper unless the event had occurred. The accomplice explained that the person who returned with the fishing tackle was one of the robbers, and it was clear that Justice had the opportunity to take and conceal the fishing tackle. In the context of this case, the relevancy on the issue of identity is obvious for this court and, consequently, that testimony was admissible under Rule

404(b), W.R.E., despite the objection of Justice and the attack that was mounted upon this evidence. *Shaffer.*

Our review of the record persuades us that the trial court also properly balanced the probative value of this evidence against the danger of unfair prejudice and appropriately resolved that issue in favor of admitting the evidence in accordance with Rule 403, W.R.E. See *Coleman.* We are satisfied that there was no error committed in the admission of the evidence of the forgery, the theft of the fishing tackle, or the explanation of Justice's articulated desire to kill the victims. We should not have addressed the testimony about Justice's desire to kill the witnesses under our usual rule of judicial restraint because that could only be considered under the plain error doctrine in the absence of objection. *Lauthern v. State,* 769 P.2d 350 (Wyo. 1989). We addressed that issue on the merits only because it was so interwoven with the other issues.

■ Having thus disposed of the concerns expressed in Justice's issues I, II, IV, and VI, we will turn to his attack upon the limiting instruction which the court gave. That instruction, read to the jury at the close of the evidence, stated:

"You are instructed that you are not to consider any evidence elicited during the trial regarding the alleged forgery of a check or the theft of fishing gear as evidence of the crime of Robbery."

Such an instruction may be given even over the objection of defense counsel at trial. *Jozen v. State,* 746 P.2d 1279 (Wyo.1987). A limiting instruction, in this context, does serve to correct possible prejudice. *Coleman,* 741 P.2d 99; *Bishop v. State,* 687 P.2d 242 (Wyo.1984), cert. denied 469 U.S. 1219, 105 S.Ct. 1203, 84 L.Ed.2d 345 (1985). Justice's suggestion that the instruction was legally insufficient and, therefore, could not serve to cure error in the admission of evidence need not be addressed because no objection was made either to the content of the instruction or to its being given to the jury. Rule 31, W.R. Cr.P.; *Sybert v. State,* 724 P.2d 463 (Wyo. 1986). For that issue to be preserved for appeal, there was a duty to make a specific legal objection, in the absence of which, reliance must be upon the plain error doctrine, which Justice does not assert. *Lauthern; Cutbirth v. State,* 663 P.2d 888 (Wyo.1983); *Britton v. State,* 643 P.2d 935 (Wyo.1982). While Justice appears to contend that such an instruction does not serve its purpose because it is not effective communication with the jury, that contention does not serve to further his argument. In the absence of evidence to the contrary, we assume that a jury has the ability to follow instructions and does abide by those instructions. *Madrid v. State,* 592 P.2d 709 (Wyo.1979); *Downs v. State,* 581 P.2d 610 (Wyo.1978).

■ We treat further, but briefly, the contention that the accomplice's testimony regarding the reaction of robbery victims was not admissible. That claim is premised upon the ground that the accomplice improperly was permitted to testify as an expert with respect to the reactions of crime victims. The record discloses that Justice simply is mistaken about the proffer of such evidence as expert testimony. In fact, it was not offered as expert opinion, but the important disclosure from the record is that no objection was made at the time the testimony was offered. The result of the failure to object is that the claim of error is waived for purposes of this appeal according to our usual rule. *Story v. State,* 721 P.2d 1020 (Wyo.1986), cert. denied 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 405 (1986). The matter cannot be approached under the plain error rule because justification does exist in the law for receiving the evidence. See *Braley v. State,* 741 P.2d 1061 (Wyo.1987); *McDaniel v. State,* 632 P.2d 534 (Wyo.1981). Thus, there does not appear to be any clear and unequivocal rule of law which the admission of this testimony clearly violated.

■ We turn then to the contention of Justice that evidence that he had no felony convictions improperly was excluded. We note first that no such evidence was offered by Justice. The subject was broached by defense counsel in his opening statement when he advised the jury that

Justice had never been convicted of a felony. The prosecutor complained about that, demanding that Justice testify or that other evidence be submitted that he had not been convicted of a felony. The court then advised the prosecuting attorney that a corrective admonition would be given to the jury unless the evidence was presented. Justice now contends that he should have been permitted to offer evidence of his good character without himself taking the stand, but that his counsel was discouraged from introducing any different evidence because of the nature of the court's ruling. The court did, in fact, advise the jury that it should disregard defense counsel's statements relating to Justice's criminal history. There is no question that this instruction was proper in the absence of evidence. *Boyd v. State,* 528 P.2d 287 (Wyo.1974), cert. denied 423 U.S. 871, 96 S.Ct. 137, 46 L.Ed.2d 102 (1975). So far as the claim that the defense was chilled by the nature of the court's ruling, there is nothing in the record to support that contention. In chambers, counsel had ample opportunity to object to the court's response, but counsel recognized the impropriety of the earlier remark in advising the court that he would not do that again. It seems clear that, in the absence of an offer of proof with respect to evidence, the claim by Justice that the presentation of his defense theory was chilled by the court's ruling is not an adequate premise upon which to base any conclusion of error. See *Jahnke v. State,* 682 P.2d 991 (Wyo.1984).

■ The final error then to be addressed is the claim of Justice that the court committed error in the admission of testimony from the victims as to the impact of the crime upon them. The State defends the admission of this testimony by distinguishing *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), upon which Justice relies. *Booth* involved the introduction of testimony relating to the victim of a homicide. The Supreme Court held that the information was not relevant to a capital sentencing decision and that the admission of the evidence created a constitutionally unacceptable risk of the im-

position of the death penalty in an arbitrary and capricious manner. It is true that the court limited the decision to the use of such testimony in the context of the *Booth* case. The State relies upon rulings in other state courts which have distinguished *Booth* and have refused to apply it to comments by a prosecutor as to the impact of crime on the victims. *People v. Dyer,* 45 Cal.3d 26, 246 Cal.Rptr. 209, 753 P.2d 1 (1988); *People v. Miranda,* 44 Cal.3d 57, 241 Cal.Rptr. 594, 744 P.2d 1127 (1987), cert. denied —— U.S. ——, 108 S.Ct. 2026, 100 L.Ed.2d 613, reh. denied —— U.S. ——, 109 S.Ct. 4, 101 L.Ed.2d 956 (1988); *State v. Brown,* 320 N.C. 179, 358 S.E.2d 1, cert. denied —— U.S. ——, 108 S.Ct. 467, 98 L.Ed.2d 406 (1987). The State also points to other cases in which the admission of such testimony has been determined to be harmless. *Hill v. Thigpen,* 667 F.Supp. 314 (N.D.Miss.1987); *People v. Poggi,* 45 Cal.3d 306, 246 Cal.Rptr. 886, 753 P.2d 1082 (1988); *State v. Post,* 32 Ohio St.3d 380, 513 N.E.2d 754 (1987), cert. denied —— U.S. ——, 108 S.Ct. 1061, 98 L.Ed.2d 1023, reh. denied, —— U.S. ——, 108 S.Ct. 1492, 99 L.Ed.2d 719 (1988); *State v. Bell,* 293 S.C. 391, 360 S.E.2d 706 (1987), cert. denied —— U.S. ——, 108 S.Ct. 734, 98 L.Ed.2d 682 (1988). In addition, the State relies upon *Killebrew v. State,* 746 S.W.2d 245 (Tex. App.1987), in which, in the context of an aggravated assault case, the Texas court concluded that victim impact testimony properly was admitted. We note that in this latter case, and in *People v. Hines,* 165 Ill.App.3d 289, 116 Ill.Dec. 382, 518 N.E.2d 1362, cert. denied —— U.S. ——, 109 S.Ct. 236, 102 L.Ed.2d 226 (1988), the victim impact evidence was admitted during the punishment phase of the proceedings.

It is clear that the testimony offered by the victims of this crime with respect to how it affected them in connection with their lives after the crime is absolutely irrelevant with respect to the issues before the jury. Their discussion of the impact of the crime upon them could not in any way serve to establish any of the elements of the crime of aggravated robbery. The only purpose must have been to attempt to arouse the passions of the jury. Conse-

quently, we are satisfied that the admission of such evidence is error, and the trial courts are cautioned not to permit such evidence to be presented unless there is a clear justification of relevance. In the context of this case, however, we are persuaded that such evidence was harmless. Given the other evidence against Justice, which the trial court aptly described as overwhelming, the admission of the testimony about the impact on the victims did not constitute prejudicial error. See *Hyde v. State*, 769 P.2d 376 (Wyo.1989); *Ortega v. State*, 669 P.2d 935 (Wyo.1983).

Because none of the claims of Justice with regard to error have been found to be correct other than the admission of the victim impact testimony, we see no need to address his claim of prejudice arising from cumulative error. A claim of cumulative error depends upon error being recognized, and that predicate is not present in this case.

We find no reversible error in the trial of this case, and the judgment and sentence is affirmed.