**Kerry Kent TAUL, Appellant
(Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

**No. 93–3.**

Supreme Court of Wyoming.

Nov. 5, 1993.

Leonard D. Munker, State Public Defender, and Deborah Cornia, Appellate Counsel, argued, for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia L. Hackl, Deputy Atty. Gen., Barbara L. Boyer, Sr. Asst. Atty. Gen., and D. Michael Pauling, Sr. Asst. Atty. Gen., argued, for appellee.

Before MACY, C.J., and THOMAS, CARDINE, GOLDEN and TAYLOR, JJ.

CARDINE, Justice.

Kerry Kent Taul was convicted by a jury of one count of aggravated robbery. Taul asserts that various errors occurred during his trial which mandate reversal of his conviction.

We affirm.

Appellant raises the following issues:

ISSUE I

Was the appellant's constitutional right to due process violated by the admission of evidence concerning the identification of his photograph and the subsequent trial identification?

ISSUE II

Did the court err in permitting the prosecution to improperly impeach two defense witnesses thus denying the appellant his right to a fair trial?

ISSUE III

Does irrelevant, inflammatory, and prejudicial testimony and exhibits intro-

duced by the prosecutor violate W.R.E. 401, 402, 403 and 901, requiring reversal?

ISSUE IV

Was the evidence produced at trial insufficient to prove beyond a reasonable doubt that the appellant committed the robbery?

ISSUE V

Did the prosecutor's improper remarks in closing argument deny appellant his right to a fair trial?

ISSUE VI

Was it an abuse of discretion for the trial court to deny appellant's motion for new trial?

ISSUE VII

Did the various errors in the admission and exclusion of evidence have a cumulative impact which requires reversal?

### FACTS

On the night of March 20, 1992, Gary Simonton (Simonton) was working as a clerk at Rips Convenience Store on Highway 30 East in Evanston, Wyoming. At approximately 9:05 p.m., a man wearing a long green military style jacket, a dark colored stocking cap, and cowboy boots entered the store. After exchanging pleasantries, the man reached into his jacket and pulled out a .45 caliber handgun. He pointed the gun at Simonton and said "[t]his is a stick up. I'm serious." He ordered Simonton to open the cash register and lie on the floor. The man then took $304.30 from the till and left the store.

While the robbery was in progress, Misty Pierce (Pierce) and her cousin, Danielle Cox, drove up to the store. While Cox went into the store for a pop, Pierce noticed the robber standing in front of the counter. She thought the robber might be someone she knew since he was wearing a coat that looked familiar. While trying to determine whether she knew the man, she saw the clerk drop behind the counter. Realizing that something was wrong, Pierce determined to get a look at the man. Pierce got a good look at his face as he came out the front door of the store; and, because she had training as an artist, she paid particularly close attention to his features.

Later that night, Simonton and Pierce went to the police station and assisted the police in creating a composite drawing of the suspect. Three days later, on March 23, two Evanston police officers were driving around town when they noticed a man who fit the description of the robbery suspect. The officers made contact with the man and learned that his name was Kerry Kent Taul (Taul).

After the officers had interviewed Taul, they obtained permission to search the apartment where he was staying. During the search, the officers found a blue stocking cap, a long green military style coat, and a black B.B. gun.

The officers took a picture of Taul and put it in a photo lineup with five others. The other photographs in the lineup were specifically included because they resembled the description of the suspect. One of the photographs was included because Taul remarked that he was often mistaken for him.

The police showed the photographs to Simonton and Pierce. Both witnesses selected Taul's picture. Pierce knew three of the other men in the photo array. However, at the time they made the lineup, the officers were not aware of that fact. Both witnesses again identified Taul as the robber at trial.

After a four-day jury trial, Taul was convicted of one count of aggravated robbery. He was sentenced to a term of not less than five years nor more than seven years in the Wyoming State Penitentiary. He now appeals.

### DISCUSSION

#### A. PRETRIAL IDENTIFICATION

■ Appellant contends that the pretrial identification procedures were unconstitutionally suggestive and unreliable. His complaint focuses on the photographic lineup used by the police. Appellant asserts that the lineup was suggestive because of police conduct in creating and showing the

lineup. He contends that it was error for the police to show the jacket to Simonton before he was shown the lineup, not that Simonton's identification was unreliable. Appellant also complains that the officers slapped hands after his picture was selected.

■ Appellant contends that the identification by Pierce was suggestive and unreliable because she knew at least three of the men in the photo array. Taul also complains that when Pierce selected his photo, she was uncertain because he looked "too white" but that the police tried to explain that away by claiming it was glare from the camera.

Appellant asserts that these improper procedures, combined with the witnesses' uncertainty in their identifications and the discrepancies between their descriptions of the robber and Taul's appearance, result in an unreliable and suggestive identification. Therefore, according to Taul, the in-court identifications, which were a product of the impermissible lineups, should not have been allowed.

■ Pretrial identification procedures violate due process if, under the totality of the circumstances, they are "so unnecessarily suggestive as to create a very substantial likelihood of an irreparable misidentification." *Green v. State*, 776 P.2d 754, 756 (Wyo.1989). If the procedures were not unnecessarily suggestive, then we need not make further inquiry. However, if the procedures are unnecessarily suggestive, then

> we weigh a number of factors against the corrupting influence of the identification procedure. We consider whether time and environmental conditions gave the witness an ample opportunity to view the perpetrator of the crime at the scene. We also examine the degree of the witness' attention to the perpetrator at that time, giving due regard to whether the witness was casually or intimately involved in the criminal event, and whether the witness had any special training or experience in making observations or identifications. Next, we analyze the ac-

curacy of any description the witness may have given prior to identifying a suspect, in terms of the time lapse between the event and the description, the extent of the characteristics described, and the extent to which those characteristics peculiarly identify the suspect. Finally, we consider the certainty with which the witness identified the suspect and the time that elapsed between the criminal encounter and the later identification.

*Green,* at 756.

We hold that the pretrial identification procedures used in this case were not unnecessarily suggestive. The police used photographs of men who were similar in appearance to the description given by the witnesses. *State v. Smith,* 520 So.2d 1305, 1307–08 (La.App.1988) (subjects displayed sufficient similarity to test identification); *State v. Dixon,* 153 Ariz. 151, 735 P.2d 761, 764 (1987) (subtle differences in photos not important as long as individuals resemble each other). The photograph of appellant was not marked or distinguishable in any way from the others. Nor did the police attempt to direct the witnesses toward selecting appellant's picture.

Whether or not Simonton was shown the jacket prior to his viewing the lineup was the subject of dispute at trial. Either way, it does not matter because the police never told Simonton where they got the jacket or if the person they got it from was in the lineup. In fact, the police testified that they told Simonton that the suspect may or may not be in the lineup before they showed it to him. The hand slapping by the police, which occurred after Simonton selected appellant's picture, did not make the lineup suggestive.

It is true that Pierce knew some of the men in the photo array. However, the police did not know that when they created the lineup, and the officers testified they would not have included those photographs if they had known. The officer's explanation to Pierce about the "whiteness" of appellant's photo came after she had selected his picture. Consequently, their com-

ments had no bearing on the identification of appellant.

In a town the size of Evanston, the quantity of pictures available for a police lineup that are similar to a particular suspect's description is necessarily limited. Thus, the police were constrained in their ability to create a photo array. Still, Pierce had to select appellant's photograph out of the remaining three. *Nave v. State*, 808 P.2d 991, 993 (Okl.Cr.1991) (lineup with as few as three photos not impermissibly suggestive unless there is improper police conduct); *State v. Humphrey*, 789 S.W.2d 186, 196 (Mo.App.1990) (showing of even a single photograph of a suspect to a witness is not impermissibly suggestive if there is no accompanying improper comment or activity on the part of the police). We cannot say that under these circumstances, the lineup was unnecessarily suggestive.

 We point out that even if we assumed the procedures were suggestive, the factors favor the admission of the photo identifications. Both witnesses had adequate time and lighting to observe appellant. One witness had special training in observing the human face, the other was intimately involved in the crime. Both witnesses gave detailed descriptions of the suspect within hours of the crime. The description was close enough to appellant to allow two police officers to pick him out as the possible robber while he was walking down the street. Both witnesses picked appellant out of a lineup three days after the crime. Simonton identified appellant as the perpetrator with certainty at the lineup and the trial. Pierce, with less certainty, also identified appellant at the lineup and at trial. However, any question about the certainty of the witnesses' identifications goes to the weight of their testimony, not to its admissibility. *Johnson v. State*, 562 P.2d 1294, 1297 (Wyo.1977). The in-court identification and the photo array identification were both admissible. *Green*, at 756; *see also Scott v. State*, 856 P.2d 447, 449 (Wyo.1993).

## B. IMPEACHMENT TESTIMONY

Appellant claims that the prosecutor used improper impeachment techniques to get into evidence inadmissible prior bad acts of the defendant. Appellant contends that the admission of this testimony violated W.R.E. 608(b), 404(b), 403, and 803.

The defense called the parents of appellant to testify as character witnesses during the trial. Defense counsel asked both of them whether their son was the type of person who would commit an armed robbery. They both responded in the negative. The defense counsel also asked the mother whether she was aware of any theft offenses that her son had been charged with or convicted of and whether she knew about a D.U.I. charge against the appellant.

On cross-examination, the prosecutor attempted to ask the father whether he knew of any other theft offenses that appellant had committed. After a lengthy side-bar, the prosecutor ended the questioning of the witness without him answering the question.

After the mother's direct testimony, the prosecutor attempted to impeach her. He tried to do that by questioning her on the date of the shoplifting incident about which she had testified on direct. He also asked her whether she knew if her son had been convicted on another theft charge. While asking these questions, the prosecutor held sheets of paper in his hand. These sheets, which defense counsel described as looking like "toilet paper," were apparently the appellant's NCIC report.

Appellant claims that the line of questioning by the prosecutor was improper. First, he claims that the acts asked about by the prosecutor were not admissible under W.R.E. 608(b) because the acts were specific instances of misconduct which had not resulted in a criminal conviction. Appellant asserts that mere arrests or charges are not proper for impeachment purposes. Second, appellant contends that the misconduct testimony elicited by the prosecutor does not fit under W.R.E. 404(a) or (b). Third, appellant complains that the

prosecutor violated 608(b) and 403 by using extrinsic evidence to impeach these witnesses. Finally, appellant contends that the use of the NCIC report by the prosecutor violated W.R.E. 403 and 803 because it lacked probative value and it was inadmissible hearsay.

■ The threshold question is whether the character evidence is admissible.

> This subdivision [404(a)] deals with the basic question whether character evidence should be admitted. Once the admissibility of character evidence in some form is established under this rule, reference must then be made to Rule 405, which follows, in order to determine the appropriate method of proof. If the character is that of a witness, see Rules 608 and 609 for methods of proof. * * * [T]he circumstantial use of character is rejected but with important exceptions: (1) an accused may introduce pertinent evidence of good character * * * in which event the prosecution may rebut with evidence of bad character.

2 Louisell & Mueller, *Federal Evidence,* Advisory Committee's Note, Rule 404 (1985). Here, the relevant character evidence concerned appellant, was not character evidence of a witness, and thus Rules 608 and 609 were not applicable.

■ The applicable rule in this situation is W.R.E. 405(a), which states:

> (a) *Reputation or opinion.*—In all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to reputation or by testimony in the form of an opinion. On cross-examination, inquiry is allowable into relevant specific instances of conduct.

*See* 2 Louisell & Mueller § 149. The cross-examination by the prosecutor in this case was proper. Defense counsel opened the door to this line of questioning by asking the witnesses whether they thought their son was the type of person who would commit an armed robbery. Thus the question by the prosecutor to the father, though he did not answer, was proper. The testimony of the mother, on direct, went into specific past acts of appellant. The prosecutor's questions to her were an appropriate response to that testimony.

The prosecutor's questions were also proper as inquiry into the basis of the defense witnesses' opinions that appellant was not the type of person to commit this crime. *See* 2 Louisell & Mueller, Advisory Committee's Note, Rule 405 (this recognition of the propriety of inquiring into specific instances of conduct does not circumscribe inquiry otherwise into the bases of opinion and reputation testimony).

■ Contrary to appellant's assertion, inquiries about past conduct of the accused, whether a conviction or an arrest, are appropriate.

> A character witness for an accused may be questioned upon cross-examination with reference to whether he has heard of the prior arrest or prosecution of the accused for a crime, or as to whether he has heard of a previous conviction of the accused.

81 Am.Jur.2d *Witnesses* § 844 (1992) (footnotes omitted). *See also United States v. Glass,* 709 F.2d 669, 673 (11th Cir.1983) (proper for prosecution to ask defense character witnesses if they had heard about alleged bribes taken by defendant sheriff); *State v. Lord,* 117 Wash.2d 829, 822 P.2d 177, 213 (1991) (defendant's character witness may be cross-examined about his personal knowledge of specific incidents of misconduct).

■ Appellant also misunderstands the nature of extrinsic evidence. Extrinsic evidence is "evidence offered other than through the witness himself * * *." 1 John W. Strong, McCormick on Evidence § 49 (4th ed. 1992). The prosecutor did not put other witnesses on the stand, nor did he put appellant's criminal record into evidence. Accordingly, the prosecutor did not attempt to prove instances of misconduct by extrinsic evidence.

■ The final contention of appellant, that the use of the NCIC report violated W.R.E. 403 and was inadmissible hearsay, also fails. While we do not condone the prosecutor's tactic, we find no error. The

jury was instructed that the report was not evidence of anything. The report was never offered into evidence. The statements contained in the report were not offered for their truth, they were used to impeach. Therefore, W.R.E. 803 and 403 were not violated by the use of the report.

### C. WITNESS TESTIMONY AND EXHIBITS

■ In this issue, appellant contends that testimony elicited from the store clerk, Simonton, by the prosecution amounted to improper victim impact testimony. Appellant also challenges, as being without relevance or proper foundation, certain physical evidence. Appellant contends that the following testimony by Simonton constituted impermissible victim impact testimony:

Q. Okay. Gary, have you ever been robbed before?

A. No, sir.

Q. Have you ever had a gun pulled on you before?

A. No, sir.

Q. Can you tell us how this affected you for the next couple of days after the robbery?

A. Every time I closed my eyes, I would see the gun pointing at me in the face and hear his voice.

Q. How about his face?

A. Yes. I would see his face, sir.

Q. Did you have trouble sleeping?

A. Yes.

Appellant asserts that this testimony is irrelevant and it constitutes reversible error as described by our decision in *Justice v. State*, 775 P.2d 1002 (Wyo.1989).

■ This testimony was not objected to at trial. Therefore, we analyze it for plain error. Appellant has the burden of proving:

(1) the record clearly shows what occurred at trial, (2) transgression of a clear and unequivocal rule of law, and (3) which adversely affected one of [Taul's] substantial rights. Failure to establish each element of this three-part test precludes a finding of plain error.

*Geiger v. State*, 859 P.2d 665, 668 (Wyo. 1993) (citations omitted).

In *Justice*, we stated that victim impact testimony is irrelevant unless there is clear justification for its admittance. *Justice*, at 1010–11. We also noted that this testimony may be harmless error, as we held it was in that case. *Id.*

However, the testimony of Simonton, taken in its totality, was not victim impact testimony. Therefore, it was relevant and admissible. The context in which the testimony was given shows that it related to Simonton's identification of appellant. The testimony about seeing the gun and the robber's face related to the witness' ability to identify appellant.

While some of the individual isolated questions and answers may have been irrelevant; as a whole, the testimony was relevant and any error presented by the irrelevant victim impact testimony was harmless.

*Geiger*, 859 P.2d at 668 (*citing Justice*, 775 P.2d at 1011).

■ Appellant's second contention is that the B.B. gun put into evidence by the State was inadmissible because it was irrelevant and without foundation. Appellant's argument rests upon the fact that the clerk, Simonton, testified that the gun used during the robbery was not a B.B. gun. Appellant concludes from this testimony that since this gun was not used in the crime, it was irrelevant evidence without foundation. Consequently, he contends that it should not have been admitted into evidence.

We first consider the foundation for the B.B. gun. The gun was moved into evidence through the testimony of police officer Chester Alexander, who testified prior to Simonton. He testified that he obtained the gun from appellant. There was no dispute that the gun belonged to appellant. Officer Alexander also testified that he was familiar with guns, and the B.B. gun resembled a .45 semi-automatic pistol.

■ W.R.E. 901(a) requires the authentication or identification of evidence as

a condition precedent to its admissibility. That requirement is satisfied "by evidence sufficient to support a finding that the matter in question is what its proponent claims." W.R.E. 901(a); *see also Westwood v. State*, 693 P.2d 763, 767 (Wyo. 1985). W.R.E. 901(b) provides by way of illustration the methods by which authentication or identification can take place. Rule 901(b)(1), for example, allows this to be done by the testimony of a witness with knowledge. The burden to show authentication is not a heavy one. *Westwood*, at 767. The rule favors the admissibility of evidence. *Id.*

In this case, Officer Alexander testified that he found the gun in the possession of appellant and that it resembled the type of gun that was allegedly used in the crime. There was sufficient evidence that the gun was what the State purported it to be—a gun owned by appellant that may have been the one used in the crime. There was sufficient evidence to support the admission of the gun.

Appellant's contention that Simonton's later testimony somehow made the gun irrelevant is without merit. Appellant lost the distinction between weight and relevancy.

> [N]one of the later proof renders irrelevant the prosecutor's evidence in the sense in which Rule 401 (and evidence law in general) employs the term. That which was received as relevant on the first day of trial, but explained away completely on the last, has not thereby become "irrelevant." * * * In the sense in which the law of evidence employs the term, relevancy describes the potential effect which evidence may reasonably have upon the perceptions of the trier of fact, * * * this means that later proof cannot render earlier proof irrelevant. If things were otherwise, the distinctions between "weight" and relevancy, and between "sufficiency" and relevancy would be lost * * *.

1 Louisell & Mueller, *Federal Evidence* § 94 (1977).

## D. SUFFICIENCY OF THE EVIDENCE

 Appellant argues that the State's witnesses' testimony was not believable because it was inconsistent and based upon suggestive lineup identifications. Appellant also suggests that his alibi witnesses were believable and their testimony was not inconsistent. Therefore, appellant surmises that there was insufficient evidence to support his conviction.

The standard we employ in reviewing sufficiency of evidence claims is well established.

> [The standard] is this court's assessment as to whether all of the evidence presented is "adequate to support a reasonable inference of guilt beyond a reasonable doubt to be drawn by the finder of fact, viewing the evidence in the light most favorable to the state." * * * We do not substitute our judgment for that of the jury in applying this rule, and our only duty is to determine if a quorum of reasonable and rational individuals would, or even could, have come to the same result the jury actually did.

*Springfield v. State*, 860 P.2d 435, 449 (Wyo.1993) (*quoting Saldana v. State*, 846 P.2d 604, 619 (Wyo.1993)).

Two witnesses identified appellant as the perpetrator. They not only identified appellant in a lineup, but also several times each in open court. As we have already explained, both witnesses had adequate opportunity to observe appellant, and their identification of him came three days after the crime. The description given to the police was close enough to appellant that two police officers picked him out as a possible suspect as he was walking on the street.

> It is not our function to assess the facts of this case or reweigh the evidence. In this process, we must assume that "the jurors believe only the evidence adverse to the defendant." It is the role of the jury, as fact finder, to evaluate the evidence by comparing the victim's description to the physical characteristics of appellant, as well as weigh the credibility of the witness. Considering all of the evidence taken together, the evidence

was sufficient for "reasonable and rational individuals" to conclude that the appellant was the perpetrator.

*Springfield,* 860 P.2d at 449 (citations omitted).

### E. STATE'S CLOSING ARGUMENT

Appellant asserts that the following comments by the prosecutor during closing argument were error:

> What this case gets down to, Ladies and Gentlemen, is very simple. Who are you going to believe? It's a question of credibility. Simple as that.
>
> * * * * * *
>
> Do you know what the odds are of two people randomly, with one in six chances, selecting the same photograph are? It's one in thirty-six? One over six. * * * One in thirty-six chances.
>
> Anyone like to bet on those kind of odds? I certainly don't. Does that just sound like it's a coincidence? One in thirty-six? I don't think so. I don't think it was coincidence. Those kids picked that photograph out because they knew that was the man they had seen at Rips East Side. Just as simple as that.
>
> * * * * * *
>
> How about the Defense witnesses? Has quantity. There was a lot more of them. We called six witnesses. The Defense called ten. Simply because you have more witnesses, does that mean that right is on your side and that truth is on your side? I don't think so. You have to look at the quality of those witnesses. At their apparent intelligence, their motives for testifying. Their apparent intelligence. Their motives for testifying. Their means of the knowledge testified to. Their interest in the outcome of the case.
>
> Well, we had two children testify here, Casey and Shannon. What a life they must live, from pillar to post. They have to—You have to feel sorry for those kids and the life they lead. And if what this story that's been concocted about what was going on that weekend was true, what a terrible weekend for these kids.

> Mom is out on a who-knows-what while this fellow that's supposed to be babysitting them is downing vodka and then hauling them around other—you know, whatever. Sounds like that was kind of a normal occurrence in those kids' lives.
>
> * * * * * *
>
> It sounded to me that Mrs. Walker spends quite a bit of time at the Eagle's Club and she might just—The days kind of run together. Certainly, she'd been drinking during that period of time. One night, she testified under oath that—you know, one of the two nights that she just got snockered. She got hammered.
>
> * * * * * *
>
> Let's talk about Tommy Hunting. Nice fellow. I suspicion that sitting around drinking a pint of vodka a night is not an unusual occurrence in his life. Certainly didn't testify that it was out of the ordinary. Certainly didn't testify that drinking a pint of vodka floored him or it made him—made him so out of control that he couldn't remember things. I don't—Ordinary, every day occurrence for the guy.

Appellant's contention is that these statements violated his right to a fair trial. Appellant contends that the argument about the odds impermissibly bolstered the identification testimony and that there was no evidence to support those statistics. He complains that there was no evidence to support the assertions that the days ran together for Mrs. Walker or that it was an ordinary occurrence for Tommy Hunting to drink a pint of vodka a night. Lastly, appellant contends that it was error for the prosecutor to express sympathy for the two children and to remark on their alleged lifestyle.

Since there was no objection to the argument at trial, our standard of review is plain error. *Barela v. State,* 787 P.2d 82, 83 (Wyo.1990). We look to see if (1) the record clearly shows the alleged error, (2) a clear and unequivocal rule of law was transgressed, and (3) a substantial right of appellant was adversely affected.

*Geiger*, 859 P.2d at 668. Plain error is difficult to find in closing argument, lest the trial court becomes required to control argument because opposing counsel does not object. *Dice v. State*, 825 P.2d 379, 385 (Wyo.1992).

We consider the prosecutor's argument in the context it was made and with regard to the evidence produced at trial. *Barela*, at 83. The prosecutor may comment on the evidence, and he may make any reasonable inferences that follow from that evidence. *McLaughlin v. State*, 780 P.2d 964, 968 (Wyo.1989). He may not, however, inflame or mislead the jury. *Dice*, at 384. The trial court is in the best position to consider the appropriateness of the argument. *Barela*, at 84. Counsel are allowed wide latitude in the scope of their argument. *Dice*, at 384.

We find no error in the prosecutor's statements. The prosecutor's comments regarding the odds of the two witnesses selecting appellant was argument based on the evidence. The key to this case was identification. The prosecutor was making an argument based on what was more likely or probable. *See Pearson v. State*, 811 P.2d 704, 707–08 (Wyo.1991). The statements were nothing more than rhetorical questions. *Id.* Consequently, they were proper and there was no error.

The other statements by the prosecutor were reasonable inferences which were based on the evidence adduced at trial. There was much testimony about the drinking of appellant's alibi witnesses. The arguments by the prosecutor were reasonably inferred from that evidence and related to their ability to remember or perceive the events of that night. The comments about the two children's testimony was also proper as it related to their credibility and their ability to accurately recall the events. There was no error in the prosecutor's closing argument.

## F. MOTION FOR A NEW TRIAL

Appellant claims that the district court abused its discretion by denying his motion for a new trial. After trial, but before sentencing, appellant moved for a new trial based upon newly discovered evidence. The decision to grant or deny a motion for a new trial rests within the sound discretion of the trial court. *Barnes v. State*, 858 P.2d 522, 536 (Wyo., 1993). The trial court's ruling will not be disturbed absent an abuse of discretion. *Id.*

Appellant must show the following in order to obtain a new trial based upon newly discovered evidence:

1. The evidence has come to his knowledge since the trial;

2. It was not owing to the want of due diligence that it did not come sooner;

3. The evidence is so material that it would probably produce a different verdict; and

4. The evidence is not cumulative.

*Id. See also Keser v. State*, 737 P.2d 756, 759–60 (Wyo.1987); *Opie v. State*, 422 P.2d 84, 85 (Wyo.1967).

The basis of the new trial motion was the testimony of appellant's cell mate. The cell mate claimed that another man had confessed to the robbery. He also claimed that the man owned a .45 caliber pistol and a green military style jacket.

The district court denied the motion for a new trial stating:

I'm going to deny the motion for new trial. I don't find the testimony of the new witness very credible. In addition to which there's other factors there that indicate that this man in the picture, this [other man], just wasn't the Defendant, wasn't the man who committed the crime.

The district court did not abuse its discretion in denying appellant's motion. Appellant fails to show how this testimony is material enough to result in a different verdict. The testimony of the cell mate would only contradict the identifications made by the two eye-witnesses. New evidence which contradicts previous evidence is not sufficient to justify a new trial. *Grable v. State*, 664 P.2d 531, 533 (Wyo. 1983) (*quoting Salaz v. State*, 561 P.2d 238, 243 (Wyo.1977)). The trial judge gave

the cell mate's testimony no credibility. The testimony at the motions hearing showed that the witness was appellant's cell mate and he was aware that appellant's family had posted a reward for exculpatory information. Consequently, we cannot say that the district court judge abused his discretion.

### F. CUMULATIVE ERROR

Appellant's final argument is that the various errors in his trial, when taken together, require reversal. Having found no error in the trial, there can be no cumulative error. *Springfield,* 860 P.2d at 453.

### CONCLUSION

Since we have found no error in any of the issues raised by appellant, his sentence is affirmed.