2002 WY 100

Ryan Lee WILKS, Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 01–51.

Supreme Court of Wyoming.

July 3, 2002.

Rehearing Denied Aug. 6, 2002.

976

Kenneth M. Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Tina N. Kerin, Assistant Appellate Counsel, Representing Appellant.

Hoke MacMillan, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and T. Alan Elrod, Assistant Attorney General, Representing Appellee.

Before HILL, C.J., and GOLDEN, LEHMAN *, KITE, and VOIGT, JJ.

* Chief Justice at time of oral argument

KITE, Justice.

[¶ 1]   A jury convicted Ryan Wilks of second-degree murder for the shooting death of a Pizza Hut delivery woman.  This case comes before us as a writ of review[1] of Mr. Wilks' judgment and sentence.  He claims multiple evidentiary errors, prosecutorial misconduct, insufficient evidence, and an excessive sentence.  Finding either no error or harmless error in connection with his trial and sentence, we affirm.

## ISSUES

[¶ 2]   Mr. Wilks presents these issues for our review:

I.   Did the trial court err in allowing victim impact testimony and victim impact argument from the prosecution?

II.   Did the trial court err in permitting improper, irrelevant and prejudicial character evidence concerning [Mr. Wilks]?

III.   Did the trial court err in permitting speculative evidence from a layperson that [Mr. Wilks] was not intoxicated shortly before the death of the victim?

IV.   Did the prosecutor commit prosecutorial misconduct in closing argument?

V.   Was there insufficient evidence to convict [Mr. Wilks] of murder in the second degree?

VI.   Did the trial court abuse its discretion in sentencing [Mr. Wilks] to 70 years to life in the Wyoming State Penitentiary?

The State of Wyoming phrases the issues as:

I.   Does the record in [Mr. Wilks'] case contain plain error relating to victim impact testimony or argument?

II.   Was any error arising from the district court's evidentiary rulings harmless?

III.   Did the district court properly admit lay testimony that [Mr. Wilks] was not

intoxicated shortly before he killed his victim?

IV.   Does the record in [Mr. Wilks'] case contain prosecutorial misconduct amounting to plain error?

V.   Does the record in [Mr. Wilks'] case contain sufficient evidence to sustain [his] conviction?

VI.   Did the district court abuse its discretion at sentencing, where [Mr. Wilks'] sentence was within the statutory limits?

## FACTS

[¶ 3]   On January 5, 2000, at approximately 9:00 p.m., Mr. Wilks ordered a pizza from Pizza Hut. The victim delivered the pizza to his residence.  Pizza Hut employees became concerned when the victim failed to return from the delivery.  Two co-employees went to search for her, and, upon arrival at the delivery residence, they observed her car with its engine running.  The victim was lying in a pool of blood next to her pizza delivery bag clutching $13 in her hand.  A loaded .38 caliber gun was lying on the floor in Mr. Wilks' kitchen.  A pathologist testified that the victim died from a single, very close-range gunshot wound in the right cheek. Mr. Wilks was apprehended at his father's home and arrested the following day.

[¶ 4]   Mr. Wilks did not testify at trial. However, even though the trial court suppressed his statement given to the police, he voluntarily introduced the statement into evidence.[2]  In his statement, Mr. Wilks related how he endured a succession of employment failures and began to spiral downward into depression.  He seldom left his apartment and admitted he drank heavily.  He had a distant relationship with his family and had no friends.  He reached his breaking point and on January 5, 2000, decided to end his life.  He claimed he drank alcohol through-

1.   This court dismissed Mr. Wilks' appeal for lack of jurisdiction under W.R.A.P. 1.03 because his notice of appeal was not filed in the district court within the W.R.A.P. 2.01 time limits.  His case was then converted *sua sponte* to a petition for a writ of review, which we granted.

2.   We note the egregious violation of Mr. Wilks' constitutional right to counsel, which occurred at the hands of both the prosecutor's office and the

police department.  Over the course of his interview, Mr. Wilks unequivocally invoked his right to counsel no less than five times and referenced his need for counsel three more times.  Each request was blatantly ignored, the first of which was ignored upon the recommendation of a prosecutor.  Obviously, we approve the trial court's ineluctable decision to suppress the statement.

out the entire day and attempted to buy a gun but was unwilling to withstand the required waiting period. He took his father's gun from the family home and called a local hotel to inquire about a room rate. He wanted to avoid committing suicide in his apartment out of respect for his landlord. However, he could not afford a room and instead chose to order his last meal from Pizza Hut.

[¶ 5] According to Mr. Wilks, when the victim arrived at his residence to deliver the pizza, an argument ensued over his forty-one-cent tip. He admitted that, in the midst of the argument, he pulled out the gun and shot the victim. He claims he "shot the wrong person" and actually intended to kill himself. He left the victim lying in front of his apartment, drove around town for several hours, and went to his father's home where he was ultimately apprehended.

[¶ 6] On January 7, 2000, Mr. Wilks was charged with one count of first-degree murder. On October 14, 2000, a jury acquitted him of first-degree murder but convicted him of the lesser-included offense of second-degree murder under Wyo. Stat. Ann. § 6–2–104 (LexisNexis 2001). The trial court sentenced him to serve not less than seventy years nor more than the term of his natural life in the Wyoming State Penitentiary. He seeks review of his judgment and sentence.

## DISCUSSION

### A. Victim Impact Testimony and Argument

[¶ 7] In Mr. Wilks' first claim of error, he asserts the trial court improperly permitted several instances of victim impact testimony and argument. With one exception, Mr. Wilks failed to object to the challenged statements at trial. We, therefore, review his claims under our three-part plain error standard:

First, the record must be clear as to the incident which is alleged as error. Second, the party claiming the error amounted to plain error must demonstrate that a clear and unequivocal rule of law was violated. Finally, that party must prove a substan-

tial right has been denied him and, as a result, he has been materially prejudiced.

*Worcester v. State*, 2001 WY 82, ¶ 7, 30 P.3d 47, ¶ 7 (Wyo.2001) (citations omitted).

[¶ 8] Wyoming law permits the trial court to consider oral or written victim impact statements prior to imposing a sentence. Wyo. Stat. Ann. §§ 7–21–101 to –103 (LexisNexis 2001). In this case, the allegations of improper victim testimony and argument arose at trial and, therefore, do not fall under §§ 7–21–101 through 7–21–103. The key inquiry on the admissibility of victim impact testimony during the guilt phase of a criminal trial is relevancy. *McCone v. State*, 866 P.2d 740, 751 (Wyo.1993). Victim impact testimony must not be permitted "unless there is a clear justification of relevance." *Justice v. State*, 775 P.2d 1002, 1011 (Wyo. 1989). Such testimony may be irrelevant if offered during the guilt phase of the trial as proof of the victim's loss; the physical, emotional, or psychological impact on the victim; or the effect upon the family. Yet, it may be relevant if offered for another proper purpose. *Id.* at 1010. Mr. Wilks contends that either the testimony and argument were irrelevant or their probative value was outweighed by their prejudice.

[¶ 9] Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." W.R.E. 401. In criminal cases, "[e]vidence is always relevant if it tends to prove or disprove one of the elements of the crime charged." *Grabill v. State*, 621 P.2d 802, 809 (Wyo.1980); *see also Lancaster v. State*, 2002 WY 45, ¶ 42, 43 P.3d 80, ¶ 42 (Wyo.2002); *Geiger v. State*, 859 P.2d 665, 667 (Wyo.1993). Relevant evidence may be excluded, however, if "its probative value is substantially outweighed by the danger of unfair prejudice." W.R.E. 403. For this court to conclude that the trial court admitted unduly prejudicial evidence in violation of W.R.E. 403, the appellant must demonstrate "that the evidence had little or no probative value and that it was extremely inflammatory or introduced for the purpose of inflaming

the jury." *Apodaca v. State,* 627 P.2d 1023, 1027 (Wyo.1981).

[¶ 10] First, Mr. Wilks challenges the testimony obtained from the victim's husband. He testified that he and the victim had breakfast together every morning they were married and, on the day she was murdered, she was in a "good mood" and was "happy and normal." The state contends this testimony was relevant to establish a foundation for the husband's knowledge of the victim's mood on the day of the murder, which in turn related to the unlikelihood that she would have engaged in an argument with Mr. Wilks. The state bolsters its theory by directing our attention to the husband's rebuttal testimony wherein he recounted an incident in which the victim received a meager tip and immediately forgave the customer, assuming the small amount was all the customer could afford to give her. We agree that, on rebuttal, there may have been some limited relevance to this testimony in an effort to impeach Mr. Wilks', assertion that the victim bickered over the tip amount. However, we cannot see how the evidence was relevant in the prosecution's case-in-chief. The prosecutor is not allowed to bootstrap relevancy in the first instance by what it subsequently offers in rebuttal testimony. Although the victim's state of mind was not relevant when offered in the prosecution's case-in-chief, we cannot say the evidence was extremely inflammatory sufficient to warrant reversal.

[¶ 11] The second instance of challenged testimony occurred when the prosecution questioned the husband about identifying the victim's body. As with several of his other contentions, Mr. Wilks makes no effort to explain how the prosecutor's question resulted in error or to point this court to any pertinent authority. Upon our own independent review, we cannot find any plain error in its admission.

[¶ 12] Third, Mr. Wilks claims the trial court erred by permitting the introduction of a photograph of the victim taken while she was alive. At trial, the state showed the victim's photograph to the husband and asked him to identify it. Defense counsel objected arguing the defense was not contesting the victim's identification and the photograph was irrelevant and prejudicial because it tended to invoke sympathy for the victim. The state argues the introduction of the photograph was relevant to show that the victim was alive before Mr. Wilks took the actions for which he was on trial. The state's contention is wholly without merit.

[¶ 13] We have said:

Generally the question of admission of photographs is left to the reasonable discretion of the trial court. However, in any case of which we are aware in which a photograph was deemed properly admitted it had some probative value. This principle would seem to be applicable to the admission of any exhibit, for if that which is offered has no probative value there would appear to be no reason for its admission.

*Reeder v. State,* 515 P.2d 969, 972 (Wyo.1973) (citations omitted); *see also Mayer v. State,* 618 P.2d 127, 130 (Wyo.1980). We adopt the following test for the use of "in life" photographs of homicide victims:

Photographs of homicide victims taken during life should be admitted to the jury only under very limited circumstances:

Photographs of [homicide] victims [taken while alive] are inadmissible unless they are relevant to some material issue and their relevancy outweighs the danger of prejudice to the defendant.... [W]here there is no purpose in introducing such pictures into evidence, such admission invokes the sympathy of the jury and constitutes error. (FN83) [3]

*Valdez v. State,* 900 P.2d 363, 380 (Okla.Crim.App.1995). Several witnesses

---

3. Footnote eighty-three reads in pertinent part:

*Staggs v. State,* 804 P.2d 456, 458 (Okl.Cr. 1991). *See also Shelton v. State,* 793 P.2d 866, 870 (Okl.Cr.1990) (concluding that "[t]his Court does not encourage the use of photographs taken of victims before their demise and we caution prosecutors to first seek other forms of proof which are less prejudicial.")....

*Valdez v. State,* 900 P.2d 363, 380 n. 83 (Okla. Crim.App.1995).

testified that the victim was alive on the day of her murder. The state, therefore, did not need the photograph to establish this fact. However, an "in life" photograph is often relevant to establish the victim's identity. Although Mr. Wilks stipulated throughout trial to causing the victim's death and her identity was not in dispute, in every homicide case the state must establish the identity of the person killed. *State v. Broberg*, 342 Md. 544, 677 A.2d 602, 610–12 (1996). Since the prosecution has the burden of proving all the elements of a crime, relevant photographs do not become inadmissible because the defendant concedes the fact and cause of the victim's death. *Seyle v. State*, 584 P.2d 1081, 1084 (Wyo.1978). Admission of homicide victims' "in life" photographs is discouraged and should be permitted under only very limited circumstances where their relevancy outweighs the potential to inflame the jury.

[¶ 14] Several jurisdictions that have considered the issue have held there is no inherent prejudice in the use of a victim's life photograph. This is especially true where the jury will also view autopsy or crime scene photographs showing the victim, as was the case in this instance. *See Commonwealth v. Rivers*, 537 Pa. 394, 644 A.2d 710, 716 (1994); *Broberg*, 677 A.2d at 610–12; *People v. Thompson*, 45 Cal.3d 86, 246 Cal.Rptr. 245, 753 P.2d 37, 54 (1988) (In Bank); *People v. Hovey*, 44 Cal.3d 543, 244 Cal.Rptr. 121, 749 P.2d 776, 791–92 (1988). Our review of the record reveals that the state did not spend a great deal of time introducing and discussing the photograph. Given the evidence against Mr. Wilks, there is no reasonable possibility the verdict might have been more favorable to him if the error had never occurred. Therefore, the introduction of the photograph was not prejudicial to Mr. Wilks.

[¶ 15] Next, he complains that two Pizza Hut employees were permitted to testify that they never saw the victim alive again and such testimony was elicited to show the trauma caused to them. We think this testimony was relevant because it tended to show the timing of the victim's death. Both witnesses were examined as to the specific events of the evening up until the time they discovered her death. The prosecutor did not explore whether the witnesses were traumatized by never seeing the victim again, and they did not elaborate. The prosecutor was simply trying to establish a timeline for the events in question; therefore, the questioning was relevant and admissible.

[¶ 16] Mr. Wilks additionally asserts that testimony elicited from the two Pizza Hut employees amounted to improper victim impact testimony. The prosecutor asked the employees whether they remained employees at Pizza Hut. The first witness responded in the negative and explained the reason for her departure: "Because this totally scared the ba-jeebers out of me. I couldn't—I couldn't—I couldn't function normally like I used to. I—it just really threw me into, you know—I felt like I was going crazy, pretty much." The second witness replied that she no longer worked for Pizza Hut "[b]ecause of—of the incident. I couldn't—I don't want to." We look to the analysis in *Justice* for guidance on how best to resolve this issue. In that case, the appellant argued the court erred in admitting the victims' testimony as to the impact of the crime upon them, and we held:

It is clear that the testimony offered by the victims of this crime with respect to how it affected them in connection with their lives after the crime is absolutely irrelevant with respect to the issues before the jury. Their discussion of the impact of the crime upon them could not in any way serve to establish any of the elements of the crime of aggravated robbery. The only purpose must have been to attempt to arouse the passions of the jury. Consequently, we are satisfied that the admission of such evidence is error, and the trial courts are cautioned not to permit such evidence to be presented unless there is a clear justification of relevance. In the context of this case, however, we are persuaded that such evidence was harmless. Given the other evidence against Justice, which the trial court aptly described as overwhelming, the admission of the testimony about the impact on the victims did not constitute prejudicial error.

*Justice*, 775 P.2d at 1010–11. Accordingly, we hold the admission of the employees' tes-

timony was without a clear justification of relevance and was calculated to arouse the passions of the jury. However, while these individual isolated questions and answers may have been irrelevant and resulted in error, as a whole, the employees' testimony was relevant. *See Taul v. State*, 862 P.2d 649, 656 (Wyo.1993) (holding certain answers by the victim amounted to irrelevant victim impact testimony; however, the testimony was harmless because, as a whole, it was clearly relevant). The first witness testified that she took Mr. Wilks' pizza order over the telephone, and the second witness arrived at the crime scene while searching for the victim. Therefore, in light of their entire testimony, the remarks by the two witnesses that amounted to irrelevant victim impact statements did not result in material prejudice to Mr. Wilks.

[¶ 17] Finally, Mr. Wilks contends the prosecutor made several remarks in closing argument and rebuttal that amounted to impermissible victim impact remarks. We believe his argument essentially asserts claims of prosecutorial misconduct, and we will, therefore, address those claims in that section of this opinion.

**B. Character Evidence**

▇▇▇ [¶ 18] Mr. Wilks argues the prosecution elicited improper testimony from his former employer who testified that she fired him in September of 1999 because he was in a physical altercation with another employee. He maintains this evidence was irrelevant, prejudicial, remote in time, and tended to make him look habitually violent, which is by definition an improper use of character evidence. He claims the trial court additionally erred in admitting a former co-employee's testimony regarding occasional derogatory comments he made. The trial court allowed the testimony under W.R.E. 801(d)(2), an admission by a party opponent. Again, Mr. Wilks asserts the remarks were irrelevant, remote in time, and prejudicial character evidence.

[¶ 19] We have said:

"Evidentiary rulings are within the sound discretion of the trial court and include determinations of the adequacy of foundation and relevancy, competency, materiality, and remoteness of the evidence. This court will generally accede to the trial court's determination of the admissibility of evidence unless that court clearly abused its discretion." *Solis v. State*, 981 P.2d 34, 36 (Wyo.1999) (citation omitted). We have described the standard of an abuse of discretion as reaching the question of the reasonableness of the trial court's choice. Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means exercising sound judgment with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. "In the absence of an abuse of discretion, we will not disturb the trial court's determination." [*Griswold v. State*, 2001 WY 14, ¶ 7, 17 P.3d 728, ¶ 7 (Wyo.2001).] The burden is on the defendant to establish such abuse.

*Skinner v. State*, 2001 WY 102, ¶ 25, 33 P.3d 758, ¶ 25 (Wyo.2001), *cert denied*, — U.S. ——, 122 S.Ct. 1554, 152 L.Ed.2d 477 (2002) (some citations omitted).

[¶ 20] Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." W.R.E. 401. "Evidence which is not relevant is not admissible." W.R.E. 402. During oral arguments, the state conceded that the witnesses' testimony was not relevant. We agree that this type of evidence was not relevant to prove or disprove any of the elements of first-degree murder or its lesser-included offenses. Therefore, we hold the trial court abused its discretion by allowing the testimony into evidence.

▇▇▇ [¶ 21] We must ascertain whether the error affects any substantial rights of the accused, providing grounds for reversal, or whether it is harmless. The harmless error standard is set out in W.R.A.P. 9.04: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded by the reviewing court." *See also* W.R.Cr.P. 52(a). An error is harmful if there is a reasonable

possibility that the verdict might have been more favorable to the defendant had the error never occurred. To demonstrate harmful error, the defendant must show prejudice under "circumstances which manifest inherent unfairness and injustice, or conduct which offends the public sense of fair play." *Johnson v. State*, 790 P.2d 231, 232 (Wyo. 1990). Under our harmless error analysis, we must judge whether the jury's verdict might have been different but for the witnesses' testimony. There are circumstances in this case which tend to alleviate any unfairly prejudicial effect the testimony may have caused. First, defense counsel effectively neutralized the suggestion that Mr. Wilks was violent or prone to vengeance on the cross-examination of both witnesses. Second, Mr. Wilks failed to show how he was prejudiced by the alleged improper testimony. In addition to the challenged testimony, the jury heard Mr. Wilks' own statement to the police wherein he admitted he shot the victim in the face after an argument concerning his meager tip. Based on the entire record, a reasonable possibility does not exist that, in the absence of the witnesses' testimony, the verdict might have been more favorable to Mr. Wilks. Therefore, we find these evidentiary errors to be harmless.

## C. Lay Testimony

[¶ 22] Whether or not Mr. Wilks was intoxicated at the time of the murder and, if so, to what extent he was intoxicated were important issues at trial.[4] The state offered lay testimony concerning his level of intoxication. A Pizza Hut employee took his pizza order over the telephone and testified that, in her opinion, he did not sound intoxicated or exhibit any of the typical signs of intoxication. She based her opinion on her prior experience in taking telephone orders from intoxicated customers. Mr. Wilks complains the trial court erred when it improperly admitted this testimony in violation of W.R.E. 701. The burden is on the appellant to establish the trial court's

4. Mr. Wilks was charged with first-degree murder, a specific intent crime. Intoxication may negate a specific intent crime but is not a defense to a general intent crime. *Streitmatter v. State*,

evidentiary ruling was an abuse of discretion. *Skinner*, 2001 WY 102, ¶ 38, 33 P.3d 758.

[¶ 23] W.R.E. 701 authorizes lay witness testimony under the following circumstances:

If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

In *State v. Cantrell*, 64 Wyo. 132, 186 P.2d 539 (1947), numerous lay witnesses were permitted to testify at trial that, based on their personal observations of the defendant, the defendant was intoxicated. We upheld the trial court's admission of the opinions concluding that lay witnesses may testify as to a defendant's intoxication provided the witnesses state the facts on which they base their opinion. 186 P.2d at 546. Our decision was based on the general proposition that most adults are sufficiently experienced with people who have been drinking to offer an opinion as to whether a person is, in fact, intoxicated from alcohol based on their personal observations. *Id.; see also State v. Nobach*, 2002 MT 91, ¶ 15, 309 Mont. 342, 46 P.3d 618.

The determination whether a person is intoxicated is open to the observation of all persons without the necessity of peculiar scientific knowledge. The recognition of intoxication, however, is one of those matters which involves the statement of the impression or belief in the mind of the witness produced by various circumstances which cannot be made intelligible to the jury apart from the impression they create. Since a description of the appearance of a person, his or her acts, gestures, looks, and other indications of a state of sobriety or of intoxication which make the impression on one's mind as to whether a person is sober or intoxicated is regarded as practically impossible, a witness who has had

981 P.2d 921, 927 (Wyo.1999). Ultimately, Mr. Wilks was acquitted of first-degree murder and convicted of second-degree murder—a general intent crime.

the opportunity to observe the facts forming the basis of his or her opinion may therefore give an opinion as to whether the person was intoxicated at the particular time in question.

31A Am.Jur.2d *Expert and Opinion Evidence* § 209 at 212–13 (1989).

[¶ 24] Here, the witness' opinion that Mr. Wilks was not under the influence of alcohol was sufficiently based on her personal observations. She initially testified as to the commonly recognizable signs of intoxication and explained her extensive experience in taking telephone orders from intoxicated customers and generally being around intoxicated persons. She then detailed her opportunity to observe Mr. Wilks' voice on the telephone. He repeatedly gave meticulous directions to his home and did not express any confusion as to what type of pizza he desired, and, although he spoke quietly, the witness was able to satisfactorily understand him throughout the entire telephone conversation. Based on her personal observations and experience, the witness concluded Mr. Wilks was not intoxicated.

[¶ 25] Mr. Wilks argues the witness was not in a suitable position to determine whether he was intoxicated because she had only an aural perception of him. An aural perception is one form of an observation, and a witness can adequately discern certain characteristics from such a perception. We will not limit the type of perceptions a witness must experience, especially given this court liberally construes W.R.E. 701 in favor of admitting opinion evidence of lay witnesses. *Rhoades v. K–Mart Corporation*, 863 P.2d 626, 633 (Wyo.1993). It is the jury's function to determine the weight to be given the evidence. In this case, the witness was entitled to rely on her lay experience and form an opinion which (1) was rationally based on her aural perception of Mr. Wilks and (2) was helpful to the jury's determination of whether he was intoxicated at the time of the murder. Accordingly, we perceive no error in the admission of the witness' lay opinion testimony.

## D.   Prosecutorial Misconduct

[¶ 26] Mr. Wilks advances several instances of alleged prosecutorial misconduct that occurred during closing argument.

Prosecutorial misconduct "has always been condemned in this state." *Earll v. State*, 2001 WY 66, ¶ 9, 29 P.3d 787, ¶ 9 (Wyo.2001) (quoting *Valerio v. State*, 527 P.2d 154, 156 (Wyo.1974)). Whether such misconduct has been reviewed on the basis of harmless error, W.R.Cr.P. 52(a) and W.R.A.P. 9.04, or on the basis of plain error, W.R.Cr.P. 52(b) and W.R.A.P. 9.05, this Court has focused on whether such error affected the accused's "substantial rights." *Id.* "The accused's right to a fair trial is a substantial right. Wyo. Const. art. 1, §§ 6, 9, and 10; *and see, e.g., Jones v. State*, 580 P.2d 1150, 1154 (Wyo.1978)." *Id.* "Before we hold that an error has affected an accused's substantial right, thus requiring reversal of a conviction, we must conclude that, based on the entire record, a reasonable possibility exists that, in the absence of the error, the verdict might have been more favorable to the accused." *Id.*

*O'Brien v. State*, 2002 WY 63, ¶ 35, 45 P.3d 225, ¶ 35 (Wyo.2002) (citation omitted). "In reviewing a claim of prosecutorial misconduct in closing argument, the court looks at the entire record to determine whether the defendant's case was so prejudiced by the improper comments as to result in the denial of a fair trial." *Burton v. State*, 2002 WY 71, ¶ 11, 46 P.3d 309, ¶ 11 (Wyo.2002). We judge the challenged comments in the context of the prosecutor's entire argument, considering the context of the statements and comparing them with the evidence produced at the trial. *Id.* The burden of establishing prosecutorial misconduct rests upon the appellant who raises the issue. The plain error standard of review set out in our discussion of the first issue applies here as well given the defense did not object to any of the challenged statements.

[¶ 27] In *Trujillo v. State*, 2002 WY 51, ¶ 5, 44 P.3d 22, ¶ 5 (Wyo.2002), this court set forth the following broad guidelines found in the Standards for Criminal Justice which are

applicable to a prosecutor's arguments to a jury:

(a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

(b) It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

(c) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

(d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

(e) It is the responsibility of the court to ensure that final argument to the jury is kept within proper, accepted bounds.

I A.B.A., Standards for Criminal Justice 3–5.8 at 3.87 to 3.88 (2d ed.1980). We will analyze each of Mr. Wilks' claims based upon the Standards for Criminal Justice.

[¶ 28] Mr. Wilks asserts the prosecutor committed misconduct when he said to the jury, "Do your duty, please, and find the Defendant guilty of First Degree Murder." We are required to look at this statement in the context it was made. The full context of the prosecutor's statement is as follows:

Read the law. Please follow the law. It's all there for you. I don't want you to twist it, I don't want you to turn it. Just read it as it is and apply the facts to the law.

There is no triumph greater that the ascertainment of the truth. That's your job. Do your duty, please, and find the Defendant guilty of First Degree Murder.

"Generally, an exhortation to the jury to 'do the right thing,' to 'do your job,' or to 'do your duty' is error if it 'impl[ies] that, in order to do so, it can only reach a certain verdict, regardless of its duty to weigh the evidence and follow the court's instructions on the law.' " *Jackson v. State,* 791 So.2d 979, 1029 (Ala.Crim.App.2000), *cert. denied,* 532 U.S. 934, 121 S.Ct. 1387, 149 L.Ed.2d 311 (2001) (quoting *Arthur v. State,* 575 So.2d 1165, 1185 (Ala.Crim.App.1990)). Such a statement may also run afoul of the admonition against injecting issues broader than the guilt or innocence of the accused. *See* Standards for Criminal Justice 3–5.8(d), *supra.* When this statement is read in context, it is clear the prosecutor was not telling the jury that fulfillment of its duty could be achieved only through a first-degree murder conviction. Rather, the prosecutor explicitly encouraged the jury to do its duty and ascertain the truth and to apply the evidence to the given law. When the statement is reviewed in context, it is apparent there was not a transgression of a clear and unequivocal rule of law.

[¶ 29] Mr. Wilks' second allegation of prosecutorial misconduct is not supported by any authority whatsoever. He claims the prosecutor erred in rebuttal by telling the jury the case was "about justice for [the victim], and it's about justice in the larger sense, and to call what happened to [the victim] Manslaughter would be a disservice to both of those things." Without a proper plain error analysis, Mr. Wilks cannot satisfy his burden of establishing prosecutorial misconduct.

[¶ 30] Next, he maintains the prosecutor misstated the evidence by stating, "[a]t some point, [Mr. Wilks] said, 'I am going to shoot this lady in the face.' " He claims nobody knows what occurred on the night in question and there is no evidence in the record to show he made such a calculated decision. While a prosecutor is not permitted to intentionally misstate the evidence or mislead the jury, he may reflect upon the evidence admitted at trial and draw reasonable inferences from that evidence. *Burton,* 2002 WY 71, ¶ 15, 46 P.3d 309. That he decided at some point to shoot the victim is a reasonable inference to be drawn from the evidence based upon the fact that he admitted aiming the gun, pulling the trigger, and

shooting her. Mr. Wilks fails to establish the second prong of the plain error analysis.

[¶ 31] His next claim of error arises when the prosecutor discussed from where Mr. Wilks retrieved the gun used in the murder. The prosecutor said, "He took a revolver, we don't know from where. There was a holster on his bed. He might have went all the way back there. 'Hold on a second. Let me get the money.' He came back with that revolver." He asserts the only evidence before the jury as to the location of the gun was introduced through his statement to the police when he said he kept the gun in the front of his waist the entire day. However, the police did find a gun holster on his bed that fit the gun used in the murder. The prosecutor is permitted to argue all reasonable inferences from the evidence. *See* Standards for Criminal Justice 3–5.8(a), *supra.*

" 'Closing arguments are meant to be just that, arguments premised upon the evidence already submitted to the jury. Prosecutors are no more limited in their closing than defense counsel. *They may review the evidence and suggest to the jury inferences based thereon.* The purpose of closing arguments is to allow counsel to offer ways of viewing the significance of the evidence. However, there are limits, not only on prosecutors, but on all attorneys.' " *Schmunk v. State,* 714 P.2d 724, 742 (Wyo.1986) (quoting *Browder v. State,* 639 P.2d 889, 893 (Wyo.1982) (emphasis in original)).

*McLaughlin v. State,* 780 P.2d 964, 970 (Wyo. 1989). The prosecutor was careful to say nobody knew where Mr. Wilks retrieved the gun from but one possible inference was that he retrieved it from his bed. The comment was well within the latitude given prosecutors in presenting the state's case; therefore, we find no error.

[¶ 32] Mr. Wilks contends prosecutorial misconduct arose from the following statement: "[T]he Defense wants to tell you, this is Manslaughter. Well, that's getting away with murder." Again, Mr. Wilks did not cite any authority to support his assertion that this statement resulted in error. "[A] prosecutor must be free to present arguments with logical force and vigor." Standards for Criminal Justice 3 5.8 at 3.88 (Commentary), *supra.* We conclude the prosecutor's statements were merely rhetorical and not improper; therefore, they did not amount to error—plain or otherwise.

[¶ 33] Finally, Mr. Wilks points to the following remarks in the prosecutor's closing argument:

He watched her as she fell to the ground onto the cold concrete and the life ran from her face, walked past her, didn't know whether she was dead, whether she was going to bleed to death, whether she was going to freeze to death, walked right past her as blood was running out of her head when she was alone, and he got in his car and he drove away. Left her there alone. He didn't know if she was dead at that time; just left her there bleeding on the concrete. He had just shot a complete stranger, the lady delivering the pizza, had just shot that lady right in the face, and then walked past her and got in his car and drove away.

[The victim] laid there, and the pathologist told you she died, that her body laid there, and it passed alone. No family or friends there to support her, nobody to hold her hand, and where today, where today, right now, as we speak, is that suicidal murderer? Where's the guy who had the loaded gun and the Defense wants you to think was suicidal? Where is he? Right there. Alive, well, surrounded by his family, his support. He's right there. You can see him. He's alive. [The victim] is in the ground. She was alive. She was alive. He stole her life.

He's suicidal. He had a loaded gun in his hands. She was this, and now she's this. And he's sitting there surrounded by his family. You'll see that photo. I don't want to shove that in your face, but the officers told you her eyes were open and they were fixed. The last thing she got to see was a stranger, a complete stranger, who she came to his house to deliver a pizza, who he beckoned to his house and killed. The last thing she saw was the wrong side of this gun being held by that

man right there. The last thing she saw was him draw it right to her face and maliciously pull the trigger. That's it. She went to deliver a pizza, he murdered her, and now she's dead. Those are facts.

. . . .

You've heard from the Defense from jury selection, opening and all the way throughout, this is about Ryan. We're here about Ryan. Well, it's not. This is about Ryan, the cold-blooded murderer. This is about Ryan who murdered [the victim], who ended a stranger's life and left her on the cold concrete to die. Have mercy, compromise, reduce it. It's only a Manslaughter. Give him a break. Well, who's not here to ask for a break? He didn't show her any mercy. She didn't get a chance to beg for her life. She didn't get a chance to mount her defense. Ryan Lee Wilks showed her no mercy.

[The victim] didn't get a chance to explain how she had some living left to do, how she wasn't ready to die, how she had had some bad things happen in her life but wanted to live on and make it better. She didn't get to sit there and explain that she may have had a Christmas without a tree, that she may have had some bad relations with family. She didn't get a chance to beg for that mercy, and he didn't give her that chance. Not once. Shot her dead, murdered her. No, she didn't get mercy. She was shot in the face by a total stranger and left alone to die.

. . . .

[The victim] didn't choose death. By all accounts that you heard, she was happy. She liked to get out and socialize with people. She didn't choose to die. That wasn't her choice. He chose that for her. He chose the time, the place and the manner that she would die. She had no choices.

The prosecution continued on rebuttal:

"Of death I dreamed." Ladies and gentlemen, maybe for the Defendant death is some romanticized idea that we can be obsessed with in heavy [metal] music and poetry, and it's some romantic idea about escape from a cruel world where he can't hold a job and he's got a drinking problem.

For [the victim] and her family, death is not some romanticized dream. It's a harsh reality that they are going to have to live with today and every day the rest of their lives.

Of death I dreamed indeed. The Defense says this is the evidence, poetry and a suicide note that was never used. It was in his pocket folded up after [the victim] had laid dead for hours and her blood was frozen on the sidewalk.

Mr. Wilks additionally posits it was error for the prosecutor to state the victim died "alone on that concrete." Finally, he complains the prosecutor improperly talked about an "interval" of time when Mr. Wilks "would have had to see the horror in her eyes as she finally, in the last second, realized what's going on, and after seeing the horror in her eyes, he had to do the final act."

[¶ 34] Again, Mr. Wilks failed to make a contemporaneous objection to the prosecutor's remarks. Rather than providing this court with a comprehensive plain error analysis, Mr. Wilks relies on conclusory statements to support his claim. As we have repeatedly stated, a prosecutor is permitted to argue all reasonable inferences from the evidence presented at trial so long as the argument is not calculated to inflame the passions or prejudices of the jury. *See* Standards for Criminal Justice 3–5.8(a), (c), *supra*. Arguing all reasonable inferences from the evidence is precisely what the prosecutor did in this case, albeit with an element of vigorous rhetoric. The sole case Mr. Wilks relies on to assert error is *Justice*, which we discussed previously in this opinion. In *Justice*, we recognized that testimony offered by the crime victims with respect to how their lives were affected after the crime was absolutely irrelevant. 775 P.2d at 1010. Likewise, the impact on an actual homicide victim prior to her death is also irrelevant. Yet, as in *Justice*, due to the overwhelming evidence presented against Mr. Wilks, we are persuaded the prosecutor's argument, in its entirety, did not constitute plain error.

### E. Sufficiency of the Evidence

[¶ 35] Mr. Wilks questions the sufficiency of the evidence to sustain his sec-

ond-degree murder conviction. "When reviewing a sufficiency of the evidence claim in a criminal case, we analyze whether a rational trier of fact could have found the essential elements of the crime were proven beyond a reasonable doubt." *Lane v. State*, 12 P.3d 1057, 1063 (Wyo.2000). "Evidence is sufficient to support a conviction if, when viewed in the light most favorable to the state, that evidence supports a reasonable inference of guilt beyond a reasonable doubt." *Yung v. State*, 906 P.2d 1028, 1037 (Wyo.1995). "We will not substitute our judgment for that of the jury but will only determine whether a quorum of reasonable and rational individuals would, or even could, have come to the same result as the jury actually did." *Lane*, 12 P.3d at 1063.

[¶ 36] For Mr. Wilks to be convicted of second-degree murder, the prosecution had to prove, beyond a reasonable doubt, that he purposely and maliciously killed the victim. Section 6–2–104. The trial court gave the jury the following proper second-degree murder instruction:

### INSTRUCTION NO. 19

The elements of the crime of Murder in the Second Degree, which must be proven, are:

1. On or about the 5th day of January, 2000
2. In Sweetwater County, Wyoming
3. The Defendant, RYAN LEE WILKS
4. Purposely and
5. Maliciously
6. Killed a human being. . . .

If you find from your consideration of all the evidence that any of these elements has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.

If, on the other hand, you find from your consideration of all the evidence that each of these elements has been proved beyond a reasonable doubt, then you should find the defendant guilty.

[¶ 37] In attacking the sufficiency of the evidence, Mr. Wilks points to a lack of evidence that he acted purposely. In making his argument, he claims the events did not transpire as he anticipated because he actually intended to kill himself, thus negating the required element of purposefulness. In *Young v. State*, 849 P.2d 754, 759 (Wyo.1993), this court drew a clear distinction between first-degree murder and second-degree murder stating, "[T]he difference between first degree murder and second degree murder is the element of premeditation and, to commit first degree murder, the defendant must have killed purposely while, to commit second degree murder, the defendant is only required to have acted purposely." First-degree murder is a specific intent crime requiring proof the defendant killed purposely and with premeditation. 849 P.2d at 759. On the other hand, second-degree murder is a crime of general intent requiring only proof of acting purposely or voluntarily. *Id.* Hence, the prosecution needed to prove only that Mr. Wilks **acted purposely** when he shot the victim.

[¶ 38] The evidence in this case demonstrates a factual basis sufficient to justify the second-degree murder conviction. Mr. Wilks relies on his statement to police officers that it "[w]asn't supposed to be like this." He contends there was nothing in his statement to prove he acted purposely. Apparently, Mr. Wilks confuses killing purposely with acting purposely, the very distinction this court has consistently drawn between first-degree murder and second-degree murder. While there may not have been sufficient evidence for a jury to conclude that Mr. Wilks committed an act with the intention of killing the victim, there was sufficient evidence for the jury to find he acted purposely beyond a reasonable doubt when he drew the gun, pointed it at the victim, and pulled the trigger.

[¶ 39] Finally, Mr. Wilks contends that, according to the *Eagan*[5] rule, the jury should have accepted his version that he did not intend for the events to occur as they did. "Where the rule is applicable, the defendant's version of a homicide must be ac-

---

5. *Eagan v. State*, 58 Wyo. 167, 128 P.2d 215, 226 (1942).

cepted even in the face of a jury verdict to the contrary." *Doe v. State*, 569 P.2d 1276, 1279 (Wyo.1977). Under the rule, an accused's testimony should be accepted if three conditions are fulfilled: (1) the defendant is the sole witness, (2) the defendant's testimony is accepted if not improbable or not inconsistent with the facts and circumstances shown, and (3) the defendant's credibility has not been impeached. *Leeper v. State*, 589 P.2d 379, 382 (Wyo.1979). However, this court will not consider a claim of error based upon the *Eagan* rule unless the defendant made a request for an instruction to the trial court. *Dangel v. State*, 724 P.2d 1145, 1149 (Wyo.1986). In this instance, Mr. Wilks did not make such a request. Furthermore, even Mr. Wilks' version of the events supports a conviction for second-degree murder because he acted purposely whether or not he intended to kill the victim. After considering this record in light of our recognized standard, we conclude there was ample evidence to justify Mr. Wilks' conviction for second-degree murder.

**F. Sentencing**

[¶ 40] Mr. Wilks contends the trial court abused its discretion by sentencing him to serve seventy years to life in the Wyoming State Penitentiary. The punishment for a crime is within the legislature's province. *Hodgins v. State*, 706 P.2d 655, 658 (Wyo.1985). Here, the legislature has provided for a sentence of up to life in prison for those convicted of second-degree murder. *See* § 6–2–104. "[W]e do not set aside a sentence if it is within the legislatively mandated minimum and maximum terms in the absence of a clear abuse of discretion." *Young v. State*, 904 P.2d 359, 362 (Wyo.1995). Since the relevant statute sets a maximum term of life in prison, Mr. Wilks' sentence is within permissible limits. However, we still "maintain a window of reviewability, even when the trial court has imposed a legally prescribed sentence." *Smith v. State*, 922 P.2d 846, 848 (Wyo.1996). Trial courts have broad discretion to determine the appropriate length of imprisonment. We recently described the standard of an abuse of discretion as "reaching the question of reasonableness of the choice made by the trial court."

*Vaughn v. State*, 962 P.2d 149, 151 (Wyo. 1998). We confirmed the following definition:

> "Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously."

*Id.* (quoting *Martin v. State*, 720 P.2d 894, 897 (Wyo.1986)).

[¶ 41] "In assessing the reasonableness of the sentence, consideration is to be given to the crime and its circumstances and the character of the criminal." *Smith*, 922 P.2d at 848–49. There is no tangible indication that Mr. Wilks had the propensity to commit this type of crime either in his criminal record or in any character description of him. However, looking to the seriousness of the crime committed, we acknowledge this was a horrific and violent crime—one that tragically ended a human life. By his own account, he summoned the victim to his home to deliver a pizza, became upset when she complained about the paucity of his tip, and shot her in the face. Although Mr. Wilks asks us to examine other second-degree murder sentences, we abide by our prior decision not to consider the sentences imposed on similarly situated defendants except in cases where the mode of punishment is unusual or the relative length of a sentence to imprisonment is extreme when compared to the gravity of the offense. *Oakley v. State*, 715 P.2d 1374, 1379 (Wyo.1986). In this case, Mr. Wilks' sentence is wholly consistent with the severity of the crime and its attendant circumstances.

[¶ 42] The trial court had the opportunity to examine the presentence investigation report and, at the sentencing hearing, to listen to evidence and argument including a detention officer's testimony, counsel's recommendations, victim impact statements, and Mr. Wilks' and his family's statements. Given the information presented and the gravity of the crime, we conclude the trial court did not act in a manner which exceeded the bounds of reason under the circumstances and did

not abuse its discretion. Upon review, therefore, we will not disturb its sentencing decision.

## CONCLUSION

[¶ 43] While we recognize certain errors were made at trial, a complete review of the record and the issues presented assures us that Mr. Wilks received a fair trial and the verdict would have been unchanged had the errors not occurred.

[¶ 44] Affirmed.